**In re PLANT INSULATION COMPANY, Debtor.**

**Fireman's Fund Ins. Co., et al., Appellants,**

v.

**Plant Insulation Co., et al., Appellees.**

No. C 12–01887 RS.
Bankruptcy No. 09–31347 TC.

United States District Court,
N.D. California,
San Francisco Division.

Oct. 9, 2012.

Order Denying Stay Nov. 1, 2012.

Cynthia L. Kendrick, Leslie A. Davis, Tacie H. Yoon, Crowell & Moring LLP, Washington, DC, Lynn H. Murray, Grippo & Elden LLC, Chicago, IL, Mark Plevin, Martha Kay Martin Crowell & Moring LLP, Joel Thomas Muchmore, Paul E.B. Glad, SNR Denton U.S. LLP, Chad A. Westfall, Musick Peeler & Garrett LLP, Philip Richard Matthews, Paul Joseph Killion, Ray L. Wong, Duane Morris LLP, San Francisco, CA, Philip Aloysius O'Connell, Jr., SNR Denton U.S. LLP, Boston, MA, Robert Millner, SNR Denton U.S. LLP Clinton Earl Cameron, Troutman Sanders LLP, Chicago, IL, Andrew T. Frankel, Craig S. Waldman, Simpson Thacher & Bartlett LLP, Kathrine A. McLendon, Mark J. Thompson, Tancred V. Schiavoni, Abby F. Rudzin, O'Melveny Myers LLP, Michael S. Davis, Zeichner Ellman & Krause LLP, New York, NY, Deborah Lynn Stein, Simpson Thacher & Bartlett LLP, Lawrence Allen Tabb, Musick Peeler & Garrett LLP, Jaclyn Ann Blankenship, Richard Blair Goetz, O'Melveny and Myers LLP, David Keane Morrison, R. Jeff Carlisle, Randall James Peters, Rosemary H. Do, Lynberg & Watkins, Eugenie Gifford Baumann, Valerie Ann Moore, Haight Brown & Bonesteel LLP, Los Angeles, CA, Jona-

than Charles Sanders Simpson Thacher Bartlett LLP, Palo Alto, CA, Alan S. Berman, The Berman Law Group, Woodland Hills, CA, Patricia Hsue, O'Melveny & Myers LLP, San Francisco, DC, for Appellants.

Michael H. Ahrens, Michael Magayne Lauter, Steven Benjamin Sacks, Sheppard Mullin Richter & Hampton LLP, San Francisco, CA, for Appellees.

## ORDER DENYING APPEAL FROM CONFIRMATION OF RESTATED SECOND AMENDED PLAN OF REORGANIZATION

RICHARD SEEBORG, District Judge.

## I. INTRODUCTION

This case confronts the legal, financial, and logistical challenges posed by reorganization of a debtor under Chapter 11 of the Bankruptcy Code, when its liabilities include the claims of future victims of asbestos. The debtor in this matter, Plant Insulation Company, sold, installed, and repaired asbestos-containing insulation and fireproofing materials in Northern California starting in 1937, and for many years acted as the exclusive distributer for asbestos producer Fibreboard Company. In the late 1970s, thousands of individuals began to file suit against Plant, claiming they had incurred injuries as a result of inhaling asbestos fibers from materials sold, installed, or repaired by the company. Until 1989, Plant was indemnified by Fibreboard, and thereafter, by its own insurers. By 2001, however, all of Plant's insurers had declared their policies to be exhausted and proceeded to defend much of the ongoing litigation under a reservation of rights only to avoid incurring default judgments. In that same year, Plant ceased operations under its own name, and transferred its installation and repair business to Bayside Insulation and Construc-

tion, Inc., a newly-formed corporation owned entirely by a principal Plant shareholder and manager. This transfer, it turns out, is the source of many of the challenges to the Reorganization Plan at issue in this case.

In 2007, representatives of Plant's asbestos injury claimants convened an informal organizing committee, the Informal Asbestos Creditors' Committee of Plant Insulation Company (the Pre–Petition Committee). The Committee eventually discovered the Bayside transaction and threatened Bayside with suit on a successor liability theory, unless Bayside agreed to merge with Plant in order to satisfy certain requirements of the Bankruptcy Code. Bayside initially refused, and was named as a defendant in several suits (and later dismissed). While negotiations between Bayside and the Pre–Petition Committee continued, Plant filed for bankruptcy under Chapter 11 in May 2009. Thereafter, the United States Trustee appointed a five-member Official Committee of Unsecured Creditors (the Committee), and a Futures Representative, acting in a fiduciary capacity to safeguard the interests of claimants who have not yet developed injuries. After further negotiations, Bayside eventually agreed to the proposed merger, and in November 2010, Plant, the Committee, and the Futures Representative (collectively, Appellees or the Plan Proponents) filed a Chapter 11 plan which entailed, among other things, the merger, and issuance of injunctive relief facilitating resolution of asbestos injury claims pursuant to 11 U.S.C. § 524(g).

The Plan seeks to balance the interests of scores of existing and anticipated future asbestos injury claims, as well as Plant's many insurers. Both sides assert very significant interests. No less than 6,244 asbestos injury claimants have asserted

claims against Plant in connection with these proceedings, totaling $1.35 billion. Likewise, a subset of Plant's insurers that have defended or settled the personal injury actions on Plant's behalf assert rights to equitable contributions from Plant's other insurers, amounting to $95.3 million. After a multiday trial, upon an extensive factual record, and in a comprehensive and well reasoned opinion, the U.S. Bankruptcy Court confirmed the Second Amended Plan of Reorganization (the Plan) of Plant Insulation Company (Plant or debtor). Appellants, consisting of insurers who did not settle outstanding coverage disputes with the debtor, appeal the decision, on the grounds that: (1) the Plan does not meet the Bankruptcy Code's requirements under 11 U.S.C. §§ 524(g), 1129(a), and (2) confirmation of the Plan would violate Appellants' rights under state and federal law. Appellants raise a number of credible objections to confirmation, owing largely to the Plan's unique features, which they contend are unfair to nonsettling insurers. While their arguments are significant, for the reasons set forth below, this Court perceives no error in the Bankruptcy Court's opinion and therefore affirms.

## II. BACKGROUND

### A. Facts [1]

For many decades, the debtor, Plant, was a major supplier of asbestos-containing products in Northern California. Like other businesses dealing in the asbestos industry, starting in approximately 1978, it began to draw thousands of lawsuits from individuals claiming serious, and in many cases fatal, injuries from inhalation of asbestos fibers.[2] Up until around 1989, Plant was defended and indemnified by Fibreboard, the asbestos manufacturer with which it had a longstanding business relationship. Thereafter, between 1987 and 2001, Plant was defended by its own, numerous insurers. Although Plant's insurers spent more than $125 million defending and indemnifying the company from litigation, those actions which proceeded to trial predominantly resulted in favorable verdicts for plaintiffs. As a result, between 1991 and 2001, Plant's insurers successively declared their various policies' limits to be exhausted. Upon the exhaustion of the last such policy in 2001, approximately 1,500 asbestos related claims remained pending against Plant.

In February of 2001, Shahram Ameli, a 49 percent shareholder, officer, and director of Plant, decided to begin his own insulation contracting business, Bayside.[3] Plant ceased operations under its own name, and transferred its installation and repair business, including all outstanding installation and repair contracts and the related job files, rights to collect outstanding accounts receivable, certain software, and $150,000 in cash, to Bayside. Plant also agreed not to file for bankruptcy for 18 months and to limit future operations. Bayside, in turn, committed to remitting 65 percent of the funds collected on outstanding accounts receivable to Plant, and to indemnify Plant for liabilities arising from those projects. A few months later,

---

1. Appellant One Beacon's unopposed motion to supplement the record (Dkt. No. 79) is granted.

2. Asbestos has been linked to asbestosis, cancer, and other maladies, and the waves of personal injury lawsuits it has generated have been described by some commentators as the longest-running mass tort litigation in this country's history. *See generally* Stephen J. Carroll, Deborah R. Hensler, et al., *Asbestos Litigation* (Rand Corp. 2005).

3. Ameli currently serves as president of Bayside and Al Badakhshan is the company's vice president.

Plant sold its remaining assets to another, unrelated insulation company.

In the years that followed, between 2001 and 2006, approximately 4,000 additional asbestos-related lawsuits were filed against Plant. Because the company had ceased operation, and with its insurance exhausted, Plant entered into informal "standstill" agreements to delay litigation of these claims, while plaintiffs pursued other possible defendants with recoverable assets. In 2001, Plant sought assistance from the California Insurance Guarantee Corporation (CIGA), as some of its insurers had themselves become insolvent. Ultimately, CIGA agreed to make $35 million available to asbestos injury claimants, 4,000 of whom applied for relief. Of those, approximately 1,100 received payment from the administrators of the CIGA fund. Plant also filed an action in San Francisco Superior Court against its insurers, seeking a judicial declaration that the aggregate limits of its liability insurance policies had not been exhausted (the Coverage Action).[4] In those proceedings, Plant contends that the policy limits apply to claims arising from "products" and "completed operations," not other "operations." The Bankruptcy Court granted relief from the stay entered in this matter to permit that litigation including crossclaims to proceed. The Coverage Action, though nearing completion at the trial level, has not yet been finally resolved. Simultaneous with filing the Coverage Action, Plant also tendered all pending asbestos injury claims against it—roughly 3,800 claims—to its primary insurers. To avoid incurring default judgments, Plant's primary insurers agreed to defend them under a reservation of rights, prompting CIGA to cease issuing payments. Thus, between 2006 and May of 2009, when Plant filed for bankruptcy, its insurers (including Appellants in this action, as well as some others which have since settled) have incurred approximately $93 million defending and indemnifying Plant, which they contend should be reimbursed, on the premise that Plant's policy limits were already exhausted.

In September of 2006, Plant asbestos claimants formed the Pre-Petition Committee, and the following year, it discovered the company's 2001 transfer of assets to Bayside. Counsel for the Pre-Petition Committee wrote to Bayside's attorney threatening to name Bayside as a defendant in pending asbestos injury lawsuits on a theory of successor liability, and demanding that Bayside merge with Plant. As will become clear, the proposed merger was significant for purposes of the legal analysis of the relief available under the Bankruptcy Code. Bayside, financially unable to defend against such claims, nonetheless initially refused to merge with Plant, and was, consequently, named in several actions which were later dismissed under a tolling agreement. Negotiations to wind up Plant's affairs continued, and in 2007 and 2009, the debtor managed to settle with two of its insurers, Sompo Japan Insurance Company of America (Sompo) and United National Insurance Company (UNIC). Those settlements provided immediate cash payments of $5.0 million and $7.5 million, respectively, and additional payments of $7.0 million and $8.0 million, conditioned upon confir-

---

**4.** As discussed below in greater detail, under California law, because injury continues after exposure, an asbestos injury claim may trigger coverage under any policy in effect at the time of, or after, the claimant's exposure to asbestos. *See Armstrong World Indus. v. Aetna Cas. & Sur. Co.,* 45 Cal.App.4th 1, 59–62, 52 Cal.Rptr.2d 690 (1996). Thus, if Plant's policies provide any coverage, multiple Plant insurers provide redundant coverage. The Coverage Action seeks clarification of this question for guidance in resolving the thousands of pending asbestos injury claims still pending against Plant.

mation of a reorganization plan by a District Court exempting the companies from all further asbestos injury claims, and claims for equitable contributions from Plant's other insurers.

On May 20, 2009, Plant filed its petition under Chapter 11. At that time, Plant had not been operational for a number of years, and its only significant assets consisted of its potential claims against its insurers, while its only significant liabilities consisted of the personal injury claims asserted against it by asbestos injury claimants, and the reimbursement claims advanced by its insurers for funds spent defending and indemnifying the company. As noted above, in consideration of Plant's petition, the U.S. Trustee appointed the Committee of Unsecured Creditors and the Futures Representatives.[5] In early 2010, Bayside finally agreed in principle to a confirmation plan under which it would merge with Plant. Negotiations continued throughout the year until the terms of the merger were finalized in November of 2010. The Second Amended Plan filed on May 2, 2011, was ultimately confirmed by the Bankruptcy Court.

## B. The Plan

The Plan provides two avenues for compensating existing and future asbestos injury claimants: (1) from a trust established under § 524(g) (the Trust), and (2) by preserving claimants' right to file tort actions against Plant and insurers that refuse to settle such claims (the Non–Settling Insurers) by making cash contributions to the Trust.[6] The § 524(g) injunction operates to create strong incentives for Plant's remaining insurers to settle their potential liabilities by making cash contributions to the Trust, or else continue to defend asbestos injury claims without any possibility of receiving reimbursement from Plant if its underlying liability policies are indeed determined to be exhausted.[7] In exchange for such settlement payments, the injunction completely releases so-called Settling Insurers from all claims brought by all parties, including tort claims asserted by asbestos injury claimants, and claims for equitable contribution that might otherwise be brought by Non–Settling Insurers.[8] The initial deadline for settlement set at the

---

5. See 11 U.S.C. § 524(g)(4)(B)(i).

6. The Bankruptcy Court referred to these twin options as an "open system," in contrast to a "closed system," in which the Trust provides the only means for recovery.

7. By way of background: because multiple insurers may be obligated to cover asbestos injuries, and each may be held liable up to the limits of the relevant policy, see supra note 2, as a practical matter, one insurer may be called upon to bear a disproportionate share of the total cost of the asserted injuries. Armstrong World Indus., 45 Cal.App.4th at 52, 52 Cal.Rptr.2d 690; Stonelight Tile, Inc. v. Cal. Ins. Guar. Ass'n, 150 Cal.App.4th 19, 37, 58 Cal.Rptr.3d 74 (2007). California courts eliminate this imbalance by recognizing the insurer's right to seek equitable contributions from other insurers, in proportion to each's fair share of costs. Fireman's Fund Ins. Co. v.

Maryland Cas. Co., 65 Cal.App.4th 1279, 1293, 77 Cal.Rptr.2d 296 (1998).

8. The § 524(g) injunction entailed in the Plan actually consists of three separate injunctions: (1) a "channeling injunction," which requires asbestos injury claimants to assert claims only against the Trust, or Plant and the Non–Settling Insurers (not reorganized Bayside nor its principals); (2) an injunction that bars Non–Settling Insurers from asserting claims for equitable contributions against Settling Insurers; and (3) an injunction that protects Settling and Non–Settling Insurers from all asbestos-related claims except (a) litigation initiated by the Trust or the reorganized Bayside (including the Coverage Action pending before the San Francisco Superior Court), (b) so-called Direct Actions, described below, brought by asbestos injury claimants against Non–Settling Insurers to determine the scope of their liability, and (c) claims for equitable

conclusion of the confirmation hearing resulted in only four settlements. Two days before the deadline passed, the Plan Proponents therefore amended the Plan to extend the deadline to 15 days after this Court affirms confirmation of the Plan. Since the Bankruptcy Court confirmed the Plan, one additional settlement has been reached.

The Plan further provides partial payment for general unsecured creditors, including insurers' claims for reimbursement, by setting aside ten percent of all available funds (e.g., insurance settlement proceeds) to the Unsecured Claims Reserve.[9] All other available cash proceeds are transferred to the Trust for reimbursement to asbestos injury claimants. Distributions to those claimants will be made according to established "Trust Distribution Procedures," which enable the Trust's administrators to determine the amount of compensable damages for each claimant, in a streamlined process, using a matrix of factors similar to those used by the CIGA fund, as well as the proportion of the Trust's funds which may be paid out to each claimant without depleting payments to future claimants.

Alternatively, under the Plan, asbestos injury claimants retain their right to pursue Plant and Non–Settling Insurers by filing a tort action, subject to several conditions. First, a determination by the Trust as to the validity or sum of compensable claims cannot provide a basis for liability in the courts. Second, if a claimant obtains a judgment against Plant, he or she may file suit (or Direct Action)

against the Non–Settling Insurers to determine whether the claim is covered by insurance. Claimants are enjoined from enforcing any such judgment against the Settling Insurers, (reorganized) Bayside, or the officers, directors, or shareholders of either Plant or Bayside. In addition, any such judgment against a Non–Settling Insurer obtained by an asbestos injury claimant must be reduced by the amount previously recovered by the claimant from the Trust. By the same token, a claimant who is fully compensated in such a Direct Action against a Non–Settling Insurer may not seek to recover from the Fund. Finally, a claimant may not proceed with a Direct Action unless he or she agrees in writing that the Non–Settling Insurer may offset from any recovery otherwise available in a final judgment, the amount of equitable contributions (including for defense costs) that would be available to the Non–Settling Insurer from other Settling Insurers, collection of which is enjoined under the Plan.[10] As Appellants stress, the foregoing deductions to Direct Action judgments are only applicable if the Action goes to trial and leads to a final judgment. In other words, those deductions are not available to the Non–Settling Insurers in asbestos-related cases that are dismissed without any payment to the claimant or settled before judgment.

As noted, the Plan also requires the merger of Plant and Bayside, under the latter's name. As part of that transaction, the Trust will invest $2 million in the reorganized Bayside and receive 40 percent of the common stock of the company in exchange, as well as a warrant to pur-

contributions advanced against the Non–Settling Insurers (such claims as the Settling Insurers may assert are assigned to the Trust).

**9.** The percentage reflects agreement between Appellants and the Plan Proponents that that the maximum amount of unsecured claims is

approximately one-tenth of existing and future asbestos injury claims.

**10.** These credits were required by the Bankruptcy Court in resolving an earlier-filed motion for summary judgment.

chase an additional 11 percent of shares (thus totaling 51 percent) at the same price point. The Trust is also to extend a five-year revolving loan to the new Bayside, with a minimum principal of $1 million, bearing interest at a rate of three points above the San Francisco Federal Reserve Bank discount rate. The Trust will also receive a promissory note for $250,000, secured by the shares of the other shareholders, due and payable to the Trust in five years at the aforementioned rate. The Trust may compel Bayside to purchase its shares after five years for a price equal to the amount invested, plus simple interest of 10 percent; but Bayside reserves the option, rather than purchasing back those common shares, to convert them to preferred stock bearing an annual cumulative dividend of 10.5 percent. Bayside may also exercise its option to repurchase the Trust's shares at a price equal to the amount invested by the Trust, plus simple interest of ten percent, so long as it simultaneously pays off the revolving loan and promissory note, in full. Reorganized Bayside is to assume Plant's responsibilities to its insurers under the latter's liability policies, post-merger.

Section 524(g)(2)(B)(ii)(IV)(bb) specifies that a reorganization plan for a debtor facing asbestos-related claims may only be confirmed if it is accepted by vote of 75 percent of present claimants. When put to that vote, all 6,244 asbestos injury claimants, who collectively assert claims totaling $1.35 billion, endorsed the Plan, and the eight Non–Settling Insurers, who advance claims worth $95.3 million, unanimously rejected it. Creditors with priority and secured claims were not entitled to vote and were deemed to accept the Plan, as it does not implicate their legal interests. Plant's shareholders also were not entitled to vote, and were deemed to have rejected the Plan, as they retain no property interests under it.[11]

Because the Non–Settling Insurers rejected the Plan, the Bankruptcy Court held a nine-day trial to resolve disputed factual issues underlying the objections raised by the Non–Settling Insurers, generating a voluminous record with particular focus on the impact of the Plan on the reorganized Bayside. Evidence was adduced to demonstrate the relative feasibility of the Plan, and to determine whether the reorganized Bayside and its shareholders provided sufficient contributions to the Trust to justify the injunctive relief afforded them under the Plan. Second, evidence was also introduced to show the financial effect of confirmation of the Plan on the Non–Settling Insurers, and more specifically, the cost of barring their claims for equitable contribution. Thus, evidence was introduced to show the relative expense incurred by insurers in prior asbestos injury cases that were dismissed without payment, as compared to those settled with payment, as well as the likely impact of the credits extended to Non–Settling Insurers on future litigation costs and settlement amounts. In its Confirmation Order (and the Supplemental Order), the Bankruptcy Court reviewed the Plan's terms, found that they ensure fair and equitable treatment of the Non–Settling Insurers, and rejected the objectors' other arguments against confirmation. This appeal followed.

### III. LEGAL STANDARD

██ Under 28 U.S.C. § 158(a), "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . [and] (3) with leave of the court, from

---

11. In point of fact, the individual shareholders actually support the Plan.

other interlocutory orders and decrees...." [12] Alternatively, the "collateral" order doctrine permits treatment of orders "that are interlocutory in nature as final" if three conditions are met: "[t]he order must (1) conclusively determine the disputed question, (2) resolve an important question completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from final judgment." *In re Westwood Shake & Shingle, Inc.*, 971 F.2d 387, 390 (9th Cir.1992). As the Bankruptcy Court correctly noted, confirmation of a reorganization plan that entails issuance of an injunction under § 524(g) is a "core" proceeding.[13] 28 U.S.C. § 157(b)(2)(L) (confirmation plans constitute core proceedings). That is so because issuance of a § 524(g) injunction "invokes a substantive right provided by [the Bankruptcy Code] and 'could only arise in the context of a bankruptcy case.'" *Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1131 (9th Cir.2010) (citing *Gruntz v. Cnty. of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1081 (9th Cir. 2000)).

Consequently, "[t]he bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error." *In re Thorpe Insulation Co.*, 677 F.3d 869, 879 (9th Cir.2012); *Beal Bank v. Crystal Props., Ltd. (In re Crystal Props., Ltd.)*, 268 F.3d 743, 755 (9th Cir. 2001) ("[T]he district court functions as an appellate court in reviewing a bankruptcy decision and applies the same standards of review as a federal court of appeals."). Of course, the de novo standard of review applies equally to the Bankruptcy Court's interpretations of the Bankruptcy Code, and the Federal Rules of Evidence. *Einstein/Noah Bagel Corp. v. Smith (In re BCE West, L.P.)*, 319 F.3d 1166, 1170 (9th Cir.2003); *Bhd. of Elec. Workers Local 2376 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 292 n. 18 (9th Cir. BAP 2009). The de novo standard also applies to "mixed questions of law and fact," which arise "when facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the legal rule." *Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.)*, 370 B.R. 236, 245 (9th Cir. BAP 2007).

**12.** All parties agree that the Bankruptcy Court's Order Confirming Amended And Restated Second Amended Plan Of Reorganization of Plant Insulation Company (the Confirmation Order), and orders subsumed within it, including the Bankruptcy Court's related Confirmation Opinion and Additional Findings of Fact and Conclusions of Law Re Plan Confirmation (the Supplemental Order), disposition of Appellants' motions for summary judgment, and related evidentiary rulings, constitute "final judgments" for purposes of § 158(a). *See Matter of Pizza Hawaii, Inc.*, 761 F.2d 1374, 1378 (9th Cir.1985). There is no agreement, however, as to whether or not the Bankruptcy Court's appointing counsel for the Committee, purportedly challenged by U.S. Fire in its appeal from the Confirmation Order, constitutes a "final judgment" that is now subject to review.

**13.** Although Appellants suggest that issuance of a § 524(g) injunction, and supporting factual findings, are "non-core" matters, such that any objections advanced under Federal Rule of Bankruptcy Procedure must be subject to de novo review by the District Court under 28 U.S.C. § 157(c)(1), the Bankruptcy Court correctly held otherwise, and accordingly, did not "submit proposed findings of fact and conclusions of law to the district court" for de novo review, per § 157(c)(1). *See id.* § 157(b)(3) ("The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11."). As Appellees correctly point out, the requirement of § 524(g)(3)(A) that the confirmation order be "issued or affirmed" by the district court under § 524(g)(3)(A) to give an associated injunction valid effect does not alter the status of these proceedings.

The District Court does not conduct its own factual findings upon review of a Bankruptcy Court's opinion. *Great Western Bank v. Sierra Woods Grp.*, 953 F.2d 1174, 1176 (9th Cir.1992). Rather, on "core" matters, it reviews the facts found below for clear error. *Chazen v. Ciolino (In re Ryan)*, 369 B.R. 536, 542 (N.D.Cal. 2007). In other words, the factual findings must be affirmed unless the District Court "has a definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

## IV. DISCUSSION

Appellants raised a number of objections to the Plan before the Bankruptcy Court, all of which were rejected, and now reassert those arguments on appeal. In summary, their objections are: (1) the proposed injunctive relief violates their Constitutional rights, exceeds the authorization provided by the Bankruptcy Code, interferes with their common law and contractual rights under state law, and contravenes general principles of equity; (2) the Plan does not meet the specific requirements of 11 U.S.C. § 524(g); (3) the Plan was not filed in "good faith" as 11 U.S.C. § 1129(a) requires; (4) continuing the deadline for settlements by insurers would further prejudice Non–Settling Insurers; (5) the Plan does not meet the "best-interest-of-creditors" test. The Bankruptcy Court rejected all of these contentions, and this Court now affirms for the reasons set forth below.

### A. Equitable contributions claims

 Appellants' primary objection to the Plan is its bar against the assertion of equitable contribution and contract claims brought by Non–Settling Insurers against Settling Insurers. Appellants insist that entry of the channeling injunction contemplated by the Plan would infringe their Constitutional rights, exceed the scope of relief contemplated under the Bankruptcy Code, interfere with their contractual rights under California law, and violate general principles of equity. As noted above, *see supra* note 6, and again by way of background: under California law, multiple insurers may be obligated to cover asbestos injuries, and each may be held liable up to the limits of their respective policies. It follows that, as a practical matter, one insurer may be called upon to bear a disproportionate share of the total cost of the asserted injuries. *Armstrong World Indus.*, 45 Cal.App.4th at 52, 52 Cal.Rptr.2d 690; *Stonelight Tile*, 150 Cal. App.4th at 37, 58 Cal.Rptr.3d 74. California courts eliminate this potential imbalance by recognizing the insurer's right to seek equitable contributions from other insurers, in proportion to each's fair share of costs. *Fireman's Fund*, 65 Cal.App.4th at 1293, 77 Cal.Rptr.2d 296. The appropriate share is determined by reference to the number of years covered by each insurer and the relevant policy limits. *Id.* at 1294, 77 Cal.Rptr.2d 296. "The doctrine of equitable contribution applies to insurers who share the *same* level of obligation on the *same* risk as to the *same* insured. As a general rule, there is no contribution between primary and excess carriers of the same insured absent a specific agreement to the contrary." *Id.* at 1294 n. 4, 77 Cal.Rptr.2d 296 (emphasis in original). Finally, California law does not provide any mechanism by which insurers may be released from equitable contributions claims; California Civil Code Procedure § 877.6, which affords a settling tort defendant protection from equitable contribution claims of other alleged tortfeasors, does not apply to claims among insurers. *Hartford Accident & Indem. Co. v. Superi-*

*or Court,* 29 Cal.App.4th 435, 440–41, 34 Cal.Rptr.2d 520 (1995). Here, for the reasons set forth below, the Bankruptcy Court correctly found that neither the Constitution, § 524(g), California contract law, nor general principles of equity, require the preservation of Non–Settling Insurers' claims for equitable contributions against Settling Insurers.

### 1. Constitutional claims

▋ As an initial matter, Appellants' Fifth Amendment and Due Process concerns may be dismissed with relative ease. Generally, of course, "[t]he bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation." *United States v. Security Indus. Bank,* 459 U.S. 70, 75, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). As the Bankruptcy Court noted, however, the exercise of the bankruptcy power also routinely impairs contractual obligations and other rights that do not rise to the level of an enforceable interest in specific property for Fifth Amendment or Due Process purposes. *See, e.g., Hanover Nat'l Bank v. Moyses,* 186 U.S. 181, 188, 22 S.Ct. 857, 46 L.Ed. 1113 (1902) ("The subject of 'bankruptcies' includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property"); *Sec. Indus. Bank,* 459 U.S. at 80, 103 S.Ct. 407 (citing *Hanover,* 186 U.S. at 188, 22 S.Ct. 857) ("The government nonetheless contends that bankruptcy statutes are usually construed to apply to preexisting rights. This statement is unobjectionable in the context of traditional contract rights …"); *Lyon v. Agusta S.P.A.,* 252 F.3d 1078, 1085–86 (9th Cir.2001) (quoting *Grimesy v. Huff,* 876 F.2d 738, 743–44 (9th Cir.1989)) ("a cause of action is a 'species

of property, a party's property right in any cause of action does not vest until a final *unreviewable* judgment is obtained' ").

▋ The threshold question, therefore, is whether the Non–Settling Insurers' contract rights and claims for equitable contributions from Settling Insurers qualify as "property interests" under the Takings Clause. The answer is easily ascertained: they do not. The Ninth Circuit has explained that claims do not vest, and hence do not rise to the level of a constitutionally-protected property interest, "until a final reviewable judgment is obtained." *In re Consol. U.S. Atmospheric Testing Litig.,* 820 F.2d 982, 988 (9th Cir.1987); *Bowers v. Whitman,* 671 F.3d 905, 914 (9th Cir.2012) ("The reason an accrued cause of action is not a vested property for Takings Clause purposes until it results in a 'final unreviewable judgment' is that it is inchoate and does not provide a certain expectation in that property interest."). *See also Duke Power Co. v. Carolina Envt'l Study Grp., Inc.,* 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (citing *Mondou v. New York, N.H. & H.R. Co.,* 223 U.S. 1, 50, 32 S.Ct. 169, 56 L.Ed. 327 (1912)) ("[o]ur cases have clearly established that a person has no property, no vested interest, in any rule of the common law" (internal quotation marks omitted)).

Here, the Non–Settling Insurers have no accrued rights in their equitable contribution claims, as they can point to no final judgment establishing such rights.[14] Instead, their claims remain unrealized, and contingent upon a whole host of outcomes in future litigation. Appellants, in urging that confirmation of the Plan would impair their constitutional rights, hardly engage in the analysis required by settled jurisprudence. Instead of addressing the con-

---

**14.** Among other things, the establishment of such rights would require a judgment in the

Coverage Action.

ditional nature of their claims, they invoke a number of cases that are easily deemed inapplicable. *In re Thorpe*, for example, does not stand for the proposition that equitable contribution claims are "property interests" within the meaning of the Takings Clause or Due Process Clause, as Appellants imply. It recognizes only that loss of a contribution claim satisfies Article III's standing requirements. 677 F.3d at 887 ("Any inadequacy in the trust threatens to diminish the value of Appellants' claims. Therefore, the insurers' allegations that the plan does not comply with the funding requirements of § 524(g) are sufficient to establish standing."). Likewise, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–29, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), also invoked by plaintiffs for the general proposition that "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause," is more limited than that statement, divorced of context, fairly suggests. In *Logan*, the Court recognized "[t]he hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Id.* at 430, 102 S.Ct. 1148. In *Logan*, the particular cause of action at issue was plaintiff's charge of unlawful termination before the state Fair Employment Practices Commission. The finding in *Logan* that plaintiff could not be stripped of such a claim without satisfying procedural due process requirements does not compel the conclusion that elimination of Appellants' equitable contribution claims violates their Constitutional rights. As the Bankruptcy Court correctly ruled, the Plan does not effect an unconstitutional taking without just compensation or a violation of Appellants' Due Process rights.

### 2. Section 524(g)

Appellants alternatively contend that the Plan's bar against assertion of equitable contribution claims by Non–Settling Insurers exceeds the scope of relief authorized under the Bankruptcy Code. Specifically, they point to § 524(g)(1)(B), which provides that "[a]n injunction may be issued ... to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, *is to be paid in whole or in part by a trust ...*" (emphasis added). Stressing that Non–Settling Insurers' equitable contributions claims would be properly asserted against Settling Insurers— rather than the Trust, as § 524(g)(1)(B) seems to contemplate—Appellants argue that the injunctive relief contemplated under the Plan is unsupportable.

Once again, however, Appellants fail to identify any authority for that argument beyond their own particular reading of the Code. A closer examination of § 524(g) reveals it is not, in the final analysis, supportive of their position. The Plan Proponents argue the identified language in § 524(g) merely refers to all claims against the debtor that are transferred to the Trust, regardless of whether they are actually "paid in whole or in part by [the] trust." In other words, the Plan Proponents read § 524(g)(1)(B) to authorize injunctive relief against contribution claims, asserted by insurers for the purpose of recovering "indirectly," on asbestos-related claims assumed by the Trust. The Plan Proponents further note that § 524(g)(4)(A)(ii) provides, in relevant part:

[S]uch an injunction [issued under § 524(g)(1) ] may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of,

claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of . . . the third party's provision of insurance to the debtor or a related party.

In advancing their alternative reading of § 524(g), the Plan Proponents stress that the foregoing provision expressly permits entry of injunctive relief to protect a debtors' insurers from "*indirect*" attempts to recover. As the Bankruptcy Court correctly noted, that section addresses the disputed issue directly and is dispositive. Appellants, however, make no attempt to harmonize § 524(g)(1)(B) with § 524(g)(4)(A)(ii), and indeed, do not even reply to the arguments the Plan Proponents raise in opposition to their appeal.

Ace Fire Underwriters Insurance Company and Ace Property & Casualty Insurance Company (collectively Ace) separately appealed the Bankruptcy Court's decision to advance virtually identical arguments.[15] Like Appellants, they urge a literal reading of the phrase, "any claim or demand that . . . is to be paid in whole or in part by a trust," which they interpret as excluding claims for reimbursement between the debtors' insurers. Ace acknowledges § 524(g)(4)(A)(ii) authorizes relief against debtors' insurers, but insists that provision is constrained by the operation of § 524(g)(1)(B), and therefore of no assistance in answering the relevant question. In other words, Ace simply concludes what it sets out to establish. Ace's Reply Br. at 2:23–24 (emphasis in original). What the statute says, however, is that "such an

injunction [under § 524(g)(1) ] *may* bar *any action* directed against a third party. . . ." 11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added). Contrary to Ace's suggestion, that language does indeed enlarge the scope of § 524(g)(1). Because Ace's argument is entirely premised on the notion that a § 524(g) injunction may not "bar any action directed against a third party," such as a claim under tort or common law, and instead may only reach those claims paid in fact by the trust, it is untenable and must be rejected.

 Responding to the Plan Proponents' reading of the statute, Ace looks to § 524(g)(2)(B)(ii)(IV)(bb), which refers to "claims [that] are to be *addressed* by a trust" (emphasis added), and insists the Court must adopt a construction of "*paid* in whole or in part by [the] trust" (emphasis added) that renders the distinction meaningful and significant. While it is true, of course, that linguistic variation within a particular statute should be honored by according different phrases distinct meanings, *see, e.g., APL Co. Pte. Ltd. v. UK Aerosols Ltd.*, 582 F.3d 947, 952 (9th Cir.2009), such principle does not excuse the Court from abiding by all of the other canons of statutory interpretation. One such competing tenet of interpretation is, "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). Similarly: "[w]ords and phrases must not be read in

---

**15.** Ace moved for leave to file a brief in support of its position in excess of the page limit, claiming that its contractual rights are "unique" and "create a separate issue that is not addressable" by other parties—a position that, upon review, appears greatly overstated. *Mot. for Leave*, at 1. In fact, Ace's arguments are overwhelmingly directed to the general propriety of the Plan's supposed interference with the Non–Settling Insurers' contractual

rights—not some peculiar aspect of its own rights that have unique legal significance. Ace apparently believes itself to be in a unique position because its coverage to Plant allegedly extended only one year, whereas other insurers had greater exposure. That fact is perhaps of some consequence as an equitable matter, but it hardly alters the applicable legal analysis.

isolation, but with an eye toward the 'purpose and context of the [whole] statute.'" *Levin v. United States*, 663 F.3d 1059, 1062 (9th Cir.2011) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006)). Here, neither Ace nor the Appellants explain how a § 524(g) injunction may reach no further than those claims to be paid in fact by the Trust, but also, as §§ 524(g)(4)(A)(ii) clearly instructs, extend to claims advanced against the debtor's insurers. Appellants' failure to harmonize those two subsections does more violence to the statute than the coherent interpretation advanced by the Bankruptcy Court and the Plan Proponents. That is, § 524(g) injunctive relief may bar claims which, though advanced against some "third party . . . alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor," are of the kind that would otherwise "be paid in whole or in part by a trust," by virtue of its assumption of the debtor's liabilities.

As one Bankruptcy Court in this District previously recognized, there is, without a doubt, some tension in these two sections.[16] *See In re Western Asbestos Co.*, 313 B.R. 832, 856 (Bankr.N.D.Cal.2003) (recognizing "the language permitting the enjoining of any claim or demand that 'is to be paid in whole or in part by a trust' does not appear to permit the enjoining of contribution claims"). Nonetheless, the *In re Western Asbestos* Court, relying upon § 524(g)(4)(A)(ii), reasoned that "for the supplemental injunction to be effective, it must bar contribution claims." *Id.* Tellingly, Ace fails to address, or even acknowledge, the holding of *In re Western Asbestos,* even though it is the most apposite precedent available. Instead, it invokes the District Court's opinion in *In re Thorpe,* which held that non-settling insurers would have standing to object to a § 524(g) injunction that barred equitable contributions claims. *See In re Thorpe Insulation Co.,* No. C 08–03711, Dkt. No. 39 (C.D.Cal. Oct. 8, 2008). Ace acknowledges, however, as it must that *In re Thorpe* does not reach the ultimate question appealed here—and indeed the issue was never litigated before the Article III courts because, upon remand, the Bankruptcy Court in that matter decided to omit any provision that would bar such claims.

Finally, the foregoing conclusion is further supported by the broader objectives of the statute. As the Bankruptcy Court reasoned, after studying § 524(g) at length, "[t]wo of the goals of section 524(g) are the equal treatment of present and future Asbestos Injury Claims, and the prompt payment of those claims." Confirmation Order, at 54. While barring Non–Settling Insurers' contributions and contract claims unquestionably exacts a financial toll upon them, it also "encourages them to pay lump-sum settlements to the trust, by providing them certainty regarding total liability and complete repose from litigation." Confirmation Order, at 54–55. That, in turn, advances the cause of the statute by making immediately available a lump sum for equitable distribution. Though such functional policy concerns cannot—and, to be clear, do not—command the particular outcome reached here,

---

16. Such observation does not suggest the issue is the close question Appellants apparently believe it to be. Although Appellants Ace and United States Fidelity & Guaranty (USFG) insist § 524(g) does not so clearly reflect Congressional intent to extinguish rights under state law as to justify a finding of preemption, the language of the statute leaves little doubt that was precisely the intent of § 524(g)'s drafters. *See* 11 U.S.C. § 524(g)(4)(A)(ii) ("such an injunction may bar *any* action directed against a third party . . ." (emphasis added)).

the Bankruptcy Court was right to emphasize "the purpose and context of the statute," in ascertaining its meaning with respect to the particular subsections at issue. *Dolan,* 546 U.S. at 486, 126 S.Ct. 1252. In sum, the Bankruptcy Court correctly concluded that § 524(g) authorizes the entry of injunctive relief barring the Non–Settling Insurers from asserting equitable contribution and contract claims against the Settling Insurers.

### 3. State law

Appellants put forth a variety of objections, ultimately unpersuasive, directed to the impact of the Plan on their rights under state law. Appellants Ace and U.S. Fidelity & Guaranty (USFG) suggest that the contemplated injunctive relief will impermissibly impair their contractual rights by affording the debtor the benefit of its insurance policies, without the attendant contractual obligations. The only precedents Ace invokes in support of this contention is an out-of-circuit opinion from a Bankruptcy Court, *In re Buffets Holdings, Inc.,* 387 B.R. 115, 119 (Bankr.D.Del.2008), and the District Court's opinion, discussed above, in *In re Thorpe.* Neither is of assistance. *In re Buffets* may hold, as a general matter, that "if [the debtor] receives the benefits he must adopt the burdens," but it is, of course, routine for debtors to be released from such burdens in bankruptcy proceedings. Although Ace fails to advance this argument beyond mere generalities, USFG argues, more specifically, that the reorganized Bayside will be partially funded and controlled by the Trust, and hence incapable of performing its duty to cooperate with USFG in the defense of claims. As a matter of fact, however, the Plan does not purport to alter Bayside's duties to perform on such contractual obligations, and USFG's speculation about interference from the Trust is just that.

■ Finally, Ace alternatively contends that permitting personal injury claimants to attempt to recover from the Trust and in the tort system would violate California's rule against "claim splitting," i.e., the precept that an entire claim cannot be divided and made the basis of several actions. That contention is utterly meritless, as submitting a claim to the Trust plainly cannot be equated with the initiation of legal action. Hence, no claim-splitting occurs.[17]

Along somewhat similar lines, certain excess insurers object that confirmation of the Plan will force them to respond to claims before the primary policies are proven to be exhausted, notwithstanding their existing contractual rights. They also worry that the Plan, if confirmed, will allow the Trust "unfettered discretion to unilaterally decide which insurer to tender the claim to or pursue a direction against." Excess Insurer Br. at 5–7.

■ Neither argument is persuasive. With respect to the former concern, the excess insurers specifically assert that § 5.2.6 of the Plan permit the reorganized debtor to tender asbestos injury claims to "Non–Settling Asbestos Insurers" for defense, without regard to whether or not those parties are primary or excess insurers. Likewise, § 5.2.7 allows a claimant who obtains a tort judgment in the courts to pursue Non–Settling Insurers for satisfaction, provided the Trust approves. The Plan Proponents insist that excess insurers need not respond to any claims they believe are beyond the scope of coverage,

---

**17.** In addition, that argument was not raised before the Bankruptcy Court and therefore need not be discussed further.

and nothing in the Plan suggests otherwise. They further note that § 6.6. of the Plan provides: "Any insurance policy acquired for the benefit of the Debtor ... before or after the Petition Date, including any Asbestos Insurance Policy, *shall remain in full force and effect after the Effective Date according to its terms,* except as otherwise provided in any Asbestos Insurance Settlement" (emphasis added).

The Plan Proponents are correct that the Plan does not compel insurers to respond to claims they believe are not covered; they are free simply to ignore such demands. Should any such claims arise, it likewise remains true that the relevant primary insurer (or the debtor, standing in the latter's shoes), must prove exhaustion as prerequisite to triggering the excess insurers' duty to defend, though that does not necessarily bar mere tender of claims. The excess insurers, while invoking a substantial body of California law that delineates the ordinary rights and obligations of excess insurers, as compared to primary insurers, are unable to invoke any authority to suggest that they must be protected from the presentation of mere *demands* for coverage in the bankruptcy process.[18] For this reason, the Plan works no impairment of the excess insurers' pre-existing contractual rights. *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 591 (9th Cir. 1983) ("The trustee in bankruptcy takes derivative rights that are not superior to those of the bankrupt."). To the extent that responding to such demands, even if meritless, will, as a practical matter, require them to incur some defense costs— expenses which might otherwise be recoverable via equitable contributions claims against settling excess insurers under the terms of the Plan—that argument is not availing for the reasons set forth above. In sum: neither the Constitution nor federal statute requires the preservation of excess insurers' equitable contributions claims.

The excess insurers' further concern, that the Trust may selectively tender claims to particular insurers over others, is entirely speculative, and in any case, has no apparent legal significance. The insurers suggest inclusion of a "neutrality" provision which would preserve the parties' contractual rights and obligations provided by the relevant insurance policies. They fail to identify any legal authority that requires such a provision in the reorganization Plan, and *Fuller–Austin,* to the extent it is invoked, certainly provides none. *See Fuller–Austin Insulation Co. v. Highlands Ins. Co.,* 135 Cal.App.4th 958, 966, 38 Cal.Rptr.3d 716 (2006) (vacating judgment as to asbestos-related judgment that was found to be inconsistent with the express terms of the reorganization plan in the underlying bankruptcy). Accordingly, the excess insurers have not identified any reason to deny confirmation of the Plan.

*4. Equity*

 Finally, Appellants invoke general principles of equity to object to issuance of the contemplated injunctive relief. Bankruptcy courts, "as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Res. Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990). For instance, under 11 U.S.C. § 105(a), a bankruptcy court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[19] In some sense, equity,

---

**18.** The foregoing is equally true with respect to claims tendered to the excess insurers by the Trust, and direct attempts by claimants to obtain satisfaction on a tort judgment.

**19.** Although the Bankruptcy Court noted its

though relatively flexible and sometimes elusive, provides Appellants the best traction for advancing their cause. The Bankruptcy Court recognized as much, and mandated, in the course of adjudicating a summary judgment motion, a provision in the Plan requiring asbestos injury claimants that elect to pursue a judgment in the tort system against Non–Settling Insurers to agree to credit against any such judgment contribution claims. As the Bankruptcy Court correctly found, this allowance is both necessary to satisfy principles of equity, and sufficient to compensate the Non–Settling Insurers.

There is precious little law to suggest that more is required. At the hearing, counsel for Appellants particularly emphasized the Sixth Circuit's opinion in *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir.2002), for the proposition that "enjoining a non-consenting creditor's claim [against a non-debtor] is only appropriate in 'unusual circumstances,'" or equivalently, "a dramatic measure to be used cautiously." In re Dow Corning was not an asbestos-related bankruptcy, and hence is not entirely analogous to present circumstances. Its articulation of the factors to be considered when issuing such injunctive relief are nonetheless instructive. The Court there held injunctive relief against a creditor's claims may be warranted if:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits

against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.* Although the present case arises in a distinct factual and legal context, strikingly, the factors set forth in *Dow Corning* are largely met here. For example, as for the first factor, claims for contributions asserted against Settling Insurers are, in essence, claims against the debtor's insurers policies, and were no injunction to issue, such claims would diminish the incentive to settle, and reduce the cash proceeds available to the Trust. Second, the Settling Insurers have each "contributed substantial assets" to the Trust, in the form of settlement proceeds. Third, again, without relief from contribution claims, there would be less incentive for Plant's insurers to resolve the disputes over coverage, and hence reorganization would be impossible. With respect to the fourth factor, here, of course, the Non–Settling Insurers did not vote to accept the Plan, in part because they believe its operation will not fully compensate them. Turning to the fifth and sixth factors, however, should Non–Settling Insurers elect to defend remaining asbestos injury claims asserted against them, all the way to a judgment, should they lose, they may deduct their contribution claims from the amount in judgment. In other words, they retain the opportunity to refuse to settle and to stand

power under § 105(a) to provide relief, it did not primarily rely on that provision for authorization of the injunctions contemplated by the Plan.

upon their rights. While Appellants dispute the significance of this option, as discussed below, the Bankruptcy Court has indeed accumulated an extensive factual record to substantiate its conclusion that the discounts against judgments available to Non–Settling Insurers provide significant relief.

The correspondence between the present case and *Dow Corning* is, of course, far from complete, and the foregoing analysis is not intended to imply reliance on the Sixth Circuit's test. Nonetheless, the comparison is useful, and in the absence of some clearer guidance that is more favorable to Appellants, it cannot be concluded that general principles of equity require Appellants be afforded greater compensation. The Bankruptcy Court did not err in this regard.

### 5. Factual findings

Alternatively, Appellants raise a host of evidentiary objections directed against the Bankruptcy Court's factual findings relative to the reductions credited against judgments obtained by asbestos injury claimants. In the first instance, even if the Non–Settling Insurers are undercompensated by the credits, to some extent, for their barred contribution claims, that does not provide any basis to reverse the Bankruptcy Court's Confirmation Order, for the reasons explained above: Appellants have simply failed to identify any provision of law or equity that requires compensation up to any particular threshold, let alone complete compensation. The Bankruptcy Court's factual findings on this question also were not clearly erroneous. As the Plan Proponents emphasize, the multiday trial was dominated by testimony directed to this issue. Appellants' attack on the testimony of three experts offered by the Plan Proponents is misplaced and

does not undermine the weight of the record supporting the Court's findings.

### B. Further requirements of § 524(g)

As noted above, a defining feature of many asbestos-related injuries is the delayed expression of symptoms, such that victims may not discover their disease for years or decades. This tragic circumstance poses particular problems in the context of bankruptcy proceedings, because the debtor therefore faces uncertain and potentially huge liabilities, while future victims are unable to participate in the proceedings. As the Bankruptcy Court noted, ordinary Chapter 11 bankruptcy proceedings would discharge all debts, thereby precluding future victims from obtaining a recovery, an unfair result that does not comport with due process values. Congress sought to address this problem with a special statutory scheme for asbestos-related Chapter 11 bankruptcies, modeled after the relief fashioned in *In re Johns–Manville Co.*, 36 B.R. 743 (Bnkr.S.D.N.Y.1984), *aff'd* 52 B.R. 940 (S.D.N.Y.1985). *See* 11 U.S.C. § 524(g); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235 n. 47 (3d Cir.2004) (*Johns–Manville* bankruptcy case provided the blueprint for the framework set forth in § 524(g)).

Section 524(g) provides a procedure by which both present and existing creditors may be protected. It provides for the creation of a trust that assumes the liabilities of the debtor for asbestos-related injuries, *see id.* at § 524(g)(2)(A), (B)(i)(I), subject to, *inter alia*, certain funding and ownership requirements, *id.* at §§ 524(g)(2)(A), (B)(i)(II)-(III), as well as the appointment of a representative to protect the interests of future asbestos injury claimants in the proceedings, *id.* at

§ 524(g)(4)(B)(i).[20] The Code also allows the issuance of injunctive relief to protect the debtor and certain third parties from asbestos-related claims after discharge, *id.* at § 524(g)(2)(A), provided the latter extend benefits to the trust sufficient to justify the relief afforded them and, in light of those benefits, that the injunction is "fair and equitable" to future claimants. *Id.* at § 524(g)(4)(B)(ii). Finally, the Code also requires a determination that "pursuit of [asbestos-related] demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands." *Id.* at § 524(g)(2)(B)(ii)(III). Appellants challenge the Plan under each of these various requirements.

### 1. Funding of the Trust

Appellants argue that the Plan may not be confirmed because it does not meet § 524(g)'s funding requirements. The relevant section of the Code requires that the Trust must "be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." *Id.* at § 524(g)(2)(B)(i)(II). The Bankruptcy Court found that this requirement was met by: (1) the $250,000 note tendered to the Trust and secured by the shares of Bayside's shareholders, (2) the Trust's receipt of 40 percent of Bayside's shares, and (3) the warrant entitling the Trust to purchase an additional 11 percent of shares at a fixed price. Supplemental Order, at 19–20.

■ Appellants, on the other hand, argue the Plan is not consistent with the letter or spirit of the Code, insofar as the Trust is to provide funding to the reorganized Bayside with a $2 million purchase of shares, and a revolving loan of at least $1 million. They insist that such an arrangement cannot be understood as "funding" of the Trust by the debtor, within the meaning of § 524(g)(2)(B)(i)(II). *See* Appellants' Joint Br. at 24 n. 123. Appellants also emphasize that, even by the Bankruptcy Court's own estimation, the true value of the Trust's ownership share in Bayside is likely to be around $500,000, and the estate probably overpaid for its ownership stake. In effect, then, the transaction depletes the Trust by approximately $1.5 million. Finally, Appellants also point out that the purchase warrant is likely to be of marginal additional value.

There is no legal authority to support Appellants' argument that if the Trust overpays for shares, it is not funded within the meaning of the Code. The problem with that view is it depends entirely on the definition of the relevant transaction. The statutory language requires only that the Trust must be "be funded in whole *or in part* by the securities...." 11 U.S.C. § 524(g)(2)(B)(i)(II) (emphasis added). Here, it is undisputed that the Trust's ownership stake in Bayside is worth something, and hence in a rather literal sense, the Trust is funded by that asset, whatever its true value may be. *See, e.g., In re Western Asbestos Co.,* 313 B.R. 832, 851 (Bankr.N.D.Cal.2003) (promissory note secured by shares is within the Code's definition of "security").

As for Appellants' further contention, that the Trust was overcharged, and hence not "funded" in any meaningful sense, there is no clear indication in the statute the purpose of the funding requirement is that the Trust emerge from the securities

---

**20.** In this matter, the Trustee appointed the Honorable Charles Renfrew (Ret.) as the Fu- tures Representative.

transaction, narrowly defined, with greater net value. More self-evident is the basic requirement that the Trust receive an ownership stake, of some value, in the reorganized debtor. Presumably, Appellants would also argue the funding requirement had not been met if the Trust paid $500,000 in consideration for its stake in reorganized Bayside, i.e., what the Bankruptcy Court found to be a fair value. Such arguments as Appellants now advance will be available in many cases, given that shares in a privately-held company, and particularly one that has recently emerged from bankruptcy, are of relatively uncertain value, and likely subject to some volatility. It may well be, in the years to come, that the value of the Trust's ownership stake increases: in that case, would it be fair to say the Trust was not "funded" by those assets? Given these inherent uncertainties, Appellants' position that § 524(g)(2)(B)(i)(II)'s funding requirement is not met here is unpersuasive.[21]

### 2. Ownership of reorganized Bayside

■ Appellants also contend the Plan does not meet the requirement that the Trust "own, or by the exercise of rights granted under [the] plan be entitled to own if specified contingencies occur, a majority of the voting shares of [the] debtor." 11 U.S.C. § 524(g)(2)(B)(i)(III). The Bankruptcy Court held the Plan satisfies this provision because: (1) the warrant permits the Trust to purchase 51 percent of outstanding shares of the reorganized Bayside, and (2) the promissory note is secured by a portion of shares in Bayside that would confer majority control on the Trust. Supplemental Order, at 20. Ap-

pellants maintain that neither of these mechanisms satisfy § 524(g)(2)(B)(i)(III).

As for the warrant, Appellants invoke *In re Western Asbestos Company* to suggest that a purchase of a majority stake can *never* satisfy § 524(g)(2)(B)(i)(III). *See* 313 B.R. at 852 n.28 ("The Plan, as originally filed, proposed that the Trust could own MacArthur's shares by purchasing them at their fair market value. The Court found that this contingency did not satisfy 11 U.S.C. § 524(g)(2)(B)(i)(III)."). The Plan Proponents reply that the option in *In re Western Asbestos Company* merely provided the Trust with the opportunity to purchase shares at a fair market price, like any other investor. Here, by contrast the purchase price is fixed, affording the Trust some marginal advantage. The Bankruptcy Court correctly concluded that the statute merely requires the option "to own if specified contingencies occur," which requirement is satisfied here. In the first place, a purchase might well be considered a "contingency" within the meaning of § 524(g)(2)(B)(i)(III), and in any case, even if it is not, the statute says nothing to prohibit such a payment. To the extent Appellants suggest the law requires the debtor to "grant" ownership shares to the Trust, that language does not foreclose a grant in exchange for cash or other valuable consideration. Accordingly, the warrant provision satisfies the requirement set forth in § 524(g)(2)(B)(i)(III).

In the alternative, the promissory note also satisfies the Code's ownership requirement. Invoking *In re Congoleum*, Appellants argue that an option to take a controlling ownership share of the debtor

---

**21.** To the extent Appellants suggest, more broadly and beyond the exchange of securities, that the value in the transaction is flowing the "wrong way," that is, from the Trust to Plant, that contention plainly loses the forest for the trees. The debtor's contributions to the Trust—its potential claims against its insurers—have so far yielded settlement payments in excess of $130 million, far exceeding the investments of the Trust in the reorganized debtor's ongoing operations.

upon default on a relatively insubstantial obligation does not comport with the statute's purpose of affording the Trust control when the debtor's shares still have some value. 362 B.R. 167, 179 (Bankr. D.N.J.2007) ("plan that would allow the Plan Trust to obtain 51 % of the shares only when the shares were not meaningful does not satisfy the requirements of § 524(g)(2)(B)(i)(III)"). In other words, they insist "that control must come at a point when control is meaningful." *Id.* at 176.

While again, Appellants' reading of the statute is certainly plausible, as the Plan Proponents point out, in *In re Congoleum,* voting control became available only after a *default* by the debtor, whereas here, the Trust may exercise its option under the warrant in a number of scenarios prior to the financial "point of no return." While *In re Congoleum* does not necessarily reflect an inaccurate reading of the ownership requirement's overall purposes, the mere fact that "Congress specified that the shares be 'voting shares' and that the shares constitute a majority" does not support the inference that the ownership provision must occur at some specific time. The Bankruptcy Court in this matter disagreed with *In re Congoleum* on this ground, because it imports into the statute a requirement that the shares must have value at the time of ownership transfer. Again, what constitutes adequate financial "value" under the circumstances, when a discharged debtor again enters financial distress, is bound to be a highly context-specific and subjective call, and not a judgment that Courts are well–suited to make without some guidance. Here, as the Bankruptcy Court correctly observed, the statute provides no such guidance whatsoever. Finally, the holding in *In re Congoleum* is inconsistent with the result reached in *In re Western Asbestos,* an opinion from this District, which approved a similar default contingency. *See* 313 B.R. at 851–52. Consequently, here, the Trust's receipt of both the purchase warrant and the promissory note satisfy § 524(g)(2)(B)(i)(III).

### 3. "Fair and equitable" benefits provided to the Trust

 Appellants next challenge confirmation of the Plan on the premise that Plant, Bayside, and their principals have failed to provide the Trust with sufficient benefits to justify the injunctive relief provided to them, from the perspective of future asbestos injury claimants. A "channeling injunction," which protects a debtor and qualified third parties from asbestos-related claims must be supported by a determination that such relief is "fair and equitable" to future claimants, "in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third parties." 11 U.S.C. § 524(g)(4)(B)(ii). In other words, the analysis appropriately focuses on the relationship between the contributions of protected entities to the Trust, and the benefits received by the same under the terms of the channeling injunction.[22]

#### a. Bayside

As an initial matter, there appears to be some disagreement as to which parties are subject to the requirements of § 524(g)(4)(B)(ii), in light of the somewhat

---

22. *See In re Quigley Co.,* 437 B.R. 102, 133 (Bankr.S.D.N.Y.2010). Appellants urge the Court to adopt the application of this standard adopted in *In re Quigley Company,* which held that "the thirdparty must contribute amounts consistent with its likely liability, at least where the plan will pay less than 100% of the scheduled amount of the asbestos claims." *Id.* Even under that standard, which need not, and is not, adopted here, the Plan would pass muster.

unusual merger transaction the Plan contemplates. All parties agree the "Protected Parties" named in the Plan include "the Reorganized Debtor," and the individual principals of Bayside. The Bankruptcy Court held that Bayside, at least in its pre-merger form, "need not satisfy the standard set forth in section 524(g)(4)(B)(ii), because it is not a 'Protected Party' under the Plan," but then proceeded to conclude that even if it is deemed to derive benefit from the channeling injunction, it has met the standard sufficient to justify relief.[23] *Id.* at 25. Appellants argue that this was error because, under the Plan, Bayside is merged into Plant to become the "Reorganized Debtor." Assuming Appellants are correct—which is not self-evident—the Bankruptcy Court nonetheless found Bayside contributed to the Trust sufficiently to justify issuance of the injunction under § 524(g)(4)(B)(ii).[24]

On that score, the Bankruptcy Court noted that the value of the injunction to pre-merger Bayside is limited, even should asbestos injury claimants attempt to recover from it on a successor theory of liability, which the Court found factually unlikely, given that it had few assets available to creditors.[25] Unlike Plant, the Court noted, pre-merger Bayside has no applicable insurance coverage, and no infusion of investment. While Appellants attempt to argue the injunction nonetheless preserves what little value remains in the company, given that mounting a defense to virtually any litigation would likely push Bayside into insolvency, somewhat inconsistently, they also insist that the successor theory of liability is frivolous. If that is so, it follows that there is little to no risk of litigation from asbestos injury claimants, and the injunctive relief provided under the Plan is, correspondingly, of marginal to no value to the company.

■ The Bankruptcy Court alternatively found that Bayside's agreement to merge with Plant generated significant value for the Trust. It noted that consummation of the merger satisfies the going-concern requirement of § 524(g), thereby permitting confirmation of the Plan, and directly generating $36.6 million in settlement payments to the Trust by the Settling Insurers that are contingent on confirmation. *See* Confirmation Order, at 43–44. Although Appellants argue that "this 'enablement' was not a contribution to the

**23.** As Appellees emphasize, the Bankruptcy Court credited the position and testimony of the Futures Representative in finding that each of the parties in line to receive protection under the injunction had contributed to the Trust sufficient benefits to merit such protection, including Bayside.

**24.** Given that holding, there is no need to resolve the question of whether or not pre-merger Bayside is subject to § 524(g)(4)(B)(ii). In any case, it is doubtful that it could be. While Appellants' position that such is a prerequisite has some appeal upon first blush, it ignores the fact that the reorganized Bayside is legally distinct from pre-merger Bayside (and from pre-merger Plant). It is, of course, reorganized Bayside, not the pre-merger entity, which receives the benefit of the injunction. It therefore makes

more sense to hold Plant to account under § 524(g)(4)(B)(ii), as it is, for all practical purposes, the entity to which the benefits of the injunction accrue. To the extent Appellants suggest otherwise, the consummation of the merger apparently has no impact on their analysis, and by that logic, the settlement proceeds Plant contributes to the Trust may also be attributed to Bayside, as it loses those assets once the merger is executed. To reiterate, however: this question need not be decided because pre-merger Bayside has contributed sufficiently.

**25.** The Court characterized the litigation brought against Bayside by the Pre–Petition Committee as an attempt to force it to cooperate with Chapter 11 proceedings, rather than a bona fide effort at recovering for asbestos injuries.

Trust," but "merely a lever to facilitate an improper § 524(g) reorganization," the distinction they urge is largely semantic, and lacks the support of legal authority. Appellants' Joint Br. at 31:11–13. Bayside plainly had a legal right not to accede to the merger, and initially exercised that right. By foregoing that right, and merging with a bankrupt entity, it enabled confirmation of the Plan and all of the benefits to the Trust provided thereunder.

Upon review, the Bankruptcy's finding on this issue is affirmed. While the threshold question of whether or not Bayside must satisfy the requirements of § 524(g)(4)(B)(ii) is open to debate, even assuming it must, here, the relatively minimal value of injunctive relief to the company is offset by the substantial value afforded to the Trust by Bayside's assent to the merger.

### b. Plant

■ The Bankruptcy Court also held that Plant had contributed significantly to the Trust, by funding it with the proceeds of its settlements with insurers.[26] Appellants' attack on the adequacy of Plant's contributions to the Trust is predicated on the notion that it does not truly own the proceeds of its liability insurance policies. Instead, Appellants argue that "the proceeds are amounts the insurer pays to the injured person, not to the Debtor." Appellants' Joint Br. at 30: 8–9. That conclusion makes little sense, and is without supporting legal authority in this Circuit.[27] *See In re Western Asbestos*, 313 B.R. at

864 ("Insurance contracts, particularly products liability policies, are included in this definition, and can even be an estate's most valuable asset. A debtor's estate is worth more with the insurance policy than without."). There can be no serious question that the debtor has contributed virtually all of its assets of value to the Trust, in satisfaction of § 524(g)(4)(B)(ii). The Bankruptcy Court's holding on this issue must therefore be affirmed.

### c. Bayside's principals

■ Appellants question whether Bayside's principals, Ameli and Badakhshan, qualify as suitable third-parties to receive protection from liability under the channeling injunction, and also doubt that they have contributed sufficient benefits. As for the former question, under the Code, Ameli and Badakhshan may qualify for protection against asbestos-related claims if, among other things, they are "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor." 11 U.S.C. § 524(g)(4)(A)(ii). While Appellants note that counsel for the Pre–Petition Committee threatened to name Ameli and/or Badakhshan in lawsuits pending against Plant or Bayside only after Bayside's counsel requested that Bayside's principals receive protection from claims, that has no apparent legal significance under the Code, and Appellants have not identified any authority to suggest otherwise. Accordingly, there is a basis to

---

**26.** As Appellees note, settlement proceeds were not the only valuable assets contributed to the Trust by the debtor. *See* Appellees' Joint Br. at 38 n. 66 (listing all assets Plant contributed to the Trust).

**27.** To the extent Appellants rely on the Fifth Circuit's observation that "[u]nder the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy," *Houston v. Edgeworth (In re Edgeworth),*

993 F.2d 51, 55–56 (5th Cir.1993), that suggestion is, by the Circuit Court's own admission inconsistent with the weight of authority. *Homsy v. Floyd (In re Vitek, Inc.),* 51 F.3d 530, 534 (5th Cir.1995) ("virtually every court to have considered the issue has concluded that the [liability insurance] policies—and clearly the proceeds of those policies—are part of debtor's bankruptcy estate").

extend injunctive relief to Ameli and Badakhshan under § 524(g)(4)(A)(ii).

■ Contrary to the conclusion of the Bankruptcy Court, Appellants also contend that Ameli and Badakhshan have not contributed sufficiently to the Trust to merit protection from asbestos-related claims. Specifically, the Court held that Bayside's principals made sufficient contributions by, among other things: (1) agreeing to sell a significant minority stake in their business, and under certain conditions, a controlling stake, (2) securing the promissory note with their ownership interests, and (3) agreeing to work for the reorganized Bayside for a period of at least five years (with incentives to stay longer). Supplemental Order, at 25–27. The Court also noted that Bayside's contributions might be attributed to Ameli and Badakhshan, as they are its shareholders. By way of analysis, the Court noted that Bayside's principals could not likely be held liable for asbestos injury claims, diminishing the effective value of the release from liability they receive under the Plan. Relatively little in the way of contribution should be expected from Ameli and Badakhshan in exchange for protection under the injunction, the Court reasoned. Appellants attempt to minimize relinquishment of ownership rights by those individuals, emphasizing that certain contingencies must come to fruition before they lose complete control. Even accepting that premise, the Bankruptcy Court did not err when it held that the surrender of 40 percent of Bayside alone is a sufficient contribution, considering the marginal value of the injunction to Ameli and Badakhshan, as individuals.

### 4. Pursuit of claims outside Plan procedures

■ Appellants fault the Bankruptcy Court's finding, per § 524(g)(2)(B)(ii)(III), that permitting the "pursuit of [asbestos-related] demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands." The Bankruptcy Court, in so finding, noted that, "[t]he pursuit of future claims outside the procedures prescribed by the Plan would threaten the Plan's equitable treatment of claims. Plant has no resources with which to pay claims." Supplemental Order, at 22. If Plant were to reach settlements on its own with its insurers, the resulting "[s]ettlement proceeds would likely be subjected to a first-come, first-served run on the bank. Future claimants would be at an increased risk of receiving nothing." Id. In other words, the Court found, "[w]ithout the establishment of some trust for present and future claimants, it is unlikely that present and future claimants will be paid on an equal basis." Confirmation Order, at 28. That finding was not in error.

Appellants purport to identify some inconsistency between the required finding under § 524(g)(2)(B)(ii)(III) that pursuit of claims outside the Plan would undermine its purposes, and the Plan's permission of claims to be brought against Non–Settling Insurers in the tort system. There is no such inconsistency. In the first place, Appellants suggest the Bankruptcy Court erred by focusing on "whether the claimants' *trust recoveries* would be treated equally," although they have no legal authority to suggest this approach was incorrect. Appellants' Joint Br. at 34:21–22. Even if it was, because the Plan expressly permits future asbestos injury claimants to advance claims against Plant and, by extension, the Non–Settling Insurers, within the courts—subject to certain specified conditions to ensure fairness to all parties, such as credits for recovery against the Trust and for Non–Settling Insurers' equitable contribution claims—the pursuit of

such claims does not occur, per the statutory language of § 524(g)(2)(B)(ii)(III), "outside the procedures prescribed by such plan." In other words, even under Appellants' theory, the effect of sending claims back to the tort system appears to be beyond the scope of the inquiry. Alternatively, Appellants suggest that because identical outcomes are not guaranteed to claimants in the tort system, sending claims in that direction does not promise equitable treatment of claims. That contention confuses equitable and fair treatment, with equal recoveries or identical results. Consistent with the Code's requirements, the Plan guarantees the former, not the latter.

Finally, and even more fundamentally, § 524(g)(2)(B)(ii)(III) does not suggest, as Appellants seem to think, that asbestos claims may not be returned to the tort system, where appropriate, as part of the reorganization Plan. As Appellants candidly acknowledged at the hearing, this is not the first reorganization plan confirmed under § 524(g) to implement such an "open" system, and because they have neglected to locate any authority disapproving such a structure, compliance with § 524(g)(2)(B)(ii)(III) provides no basis to reverse the Bankruptcy Court's confirmation of the Plan in this case.

*C. Requirements of § 1129(a)*

*1. Feasibility*

■ To merit confirmation, the Bankruptcy Code requires that a reorganization plan be found feasible, or in other words, "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). To make this showing, the Plan Proponents need not show guaranteed success, but only that the Plan has a reasonable likelihood of success (i.e.,

more likely than not to succeed). *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 787 F.2d 1352, 1364 (9th Cir.1986). Appellees emphasize the fact-intensive nature of this inquiry, and the "relatively low threshold of proof." *See Computer Task Grp. v. Brotby (In re Brotby),* 303 B.R. 177, 191 (9th Cir. BAP 2003). Because the parties appear to agree on the applicable legal standard, the dispute focuses on the factual findings of the Bankruptcy Court, which are reviewed for clear error.

■ The Bankruptcy Court determined that the Plan is feasible under § 1129(a)(11) because: (1) Bayside survived as a going concern for the last ten years, and has avoided a loss for the last seven; (2) it survived the recent recession, despite a significant tax lien, and threats of asbestos litigation; (3) the Plan improves reorganized Bayside's financial condition; and (4) overall, macroeconomic conditions are expected to improve. Confirmation Order, at 42–43. In so holding, the Court recognized that the Plan Proponents' financial projections concerning Bayside were overly optimistic, but nonetheless held: "that Reorganized Bayside is not likely to meet the Projections does not necessarily mean that it is unlikely to survive as an operating business, and that the plan does not satisfy the feasibility requirement of section 1129(a)(11)." Confirmation Order, at 41.

The factual record supporting the Court's determination is quite extensive. While Appellants have, unsurprisingly, managed to identify a few pieces of evidence in the record that suggest Bayside may struggle to stay afloat, they do not generally undermine the overall judgments of the Court in light of the record. Contrary to Appellants' suggestions, it was perfectly appropriate for the Bankruptcy Court to consider Bayside's track record over the last number of years in assessing

its prospects for the future, as well as general macroeconomic conditions. None of Appellants' arguments warrant reversal of the Bankruptcy Court's well-considered determination on this question.

### 2. Good faith

USFG, joined by Appellants in their Joint Brief, contends that the Plan may not be confirmed because it was not "proposed in good faith," as required under 11 U.S.C. § 1129(a)(3).[28] Specifically, USFG contends the Plan does not advance the objectives of the Code, was not necessary, and was filed by Plant merely to obtain a litigation advantage over Non–Settling Insurers—namely, to force them to settle coverage disputes. It proceeds to argue that the Plan fails the good faith test because the merger was coerced and unjustified by business considerations. Finally, USFG asserts that the Plan cannot meet the good faith test because it does not adequately preserve the going-concern value of Plant. Separately, Appellant U.S. Fire (USF) contends the Plan does not meet § 1129(a)(3)'s good faith standard because counsel to the Committee was allegedly compromised by a conflict of interest. For the reasons set forth below, none of these contentions is persuasive.

 The parties agree on the basic contours of the applicable legal standard. Section 1129(a)(3) requires, in relevant part: "The court shall confirm a plan only if all of the following requirements are met: ... The plan has been proposed in good faith and not by any means forbidden by the law." "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code. The requisite good faith determina-

tion is based on the totality of the circumstances." *Platinum Capital, Inc v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir.2002), *cert. denied* 538 U.S. 1035, 123 S.Ct. 2097, 155 L.Ed.2d 1065 (2003). This is a "case-by-case" determination. *Id.* at 1075. "The fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith." *Id.* at 1075 (quoting *In re PPI Enters., Inc.*, 228 B.R. 339, 344–45 (Bankr. D.Del.1998)). Naturally, that is so because, "[i]n enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy rights." *Id.* A proposed plan does not meet the good faith standard, however, if it is intended "to obtain tactical litigation advantages" that are "not within the legitimate scope of the bankruptcy laws." *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir.1999).

 The debate over "good faith" largely flows from the respective sides' views of the Plan's overall legality, and hence legitimacy. For example, USFG insists the Plan was proposed to force "Appellants to bear the full responsibility for [asbestos injury] claims under extraordinarily prejudicial circumstances," or as "simply a vehicle for the Plan Proponents and their counsel to pursue disputed claims for insurance coverage from insurers." USFG Br. at 9, 13. The Plan Proponents note, in response, that the Bankruptcy Court found confirmation of the Plan would advance several objectives of § 524(g)—namely, the equal treatment of present and future claims, the preservation

---

**28.** Although USFG also reiterates, at length, the arguments raised by other Appellants in connection with the Plan's interference with rights arising under California law, those ar-

guments fail for the reasons stated above, and need not be rehashed under § 1129(a)(3)'s rubric of "good faith."

of going-concern value, and the relatively immediate payment of asbestos injury claims. Confirmation Order, at 24–27. As the foregoing discussion indicates, those findings are in accord with the factual record. As a reorganization plan need not satisfy each and every goal of the Code to satisfy the good faith standard, discussion of the remaining findings not otherwise addressed above—and in particular, preservation of value—is not technically required.

■ Addressing it nonetheless, Appellants do not appear to question that such is the objective of the Bankruptcy Code, but instead insist the Plan does not preserve the debtor's value as an ongoing concern because it ceased operations years ago. That contention impermissibly ignores the unusual factual circumstances that explain the structure of the reorganization Plan in this case and its actual effects upon the debtor's operations. *In re Sylmar Plaza, L.P.*, 314 F.3d at 1074 (good faith inquiry entails consideration of "totality of circumstances"). As the record amply demonstrates, the Plan is designed to account for the fact that Plant's principals transferred its assets and ongoing operations to Bayside, leaving the debtor a shell of its former self. To the suggestion in the record that the transaction was intended to shield Plant's assets from asbestos injury claims, the Plan is largely designed to reverse such an eventuality.[29] Having divested itself of its assets, the debtor may not have qualified for relief under § 524(g). The merger and related Plan provisions clearly reinvigorate the debtor's operations and renew its going-concern value by returning to it its prior business and supplying a

relatively limited line of credit. To the extent Appellants suggest under the Code, a plan of reorganization may not re-initiate or strengthen the debtor's going-concern value, as the Plan does here, there is no authority for that proposition, and further, in light of the Bankruptcy Code's extensive findings on this issue, such conclusion is unsupportable.[30] *See, e.g., In re Western Asbestos,* 313 B.R. at 853–54 (post-confirmation business operations prerequisite to invocation of § 524(g)).

■ Turning to the other arguments advanced by Appellants in opposition to confirmation on good faith grounds, they maintain Plant's Chapter 11 petition was not filed out of necessity, and instead represents an improper attempt to gain tactical advantage through implementation of the Plan. As the Bankruptcy Court correctly found, this argument is without merit. In the absence of the Plan, there would be no adequate, alternative means to address existing and future asbestos injury claims fairly, or to protect insurers that wish to settle, and thereby escape finally the uncertainties of protracted litigation. There is no dispute that the debtor lacks any significant assets, or that Plant's insurers have declared its policies to be exhausted. Should the latter prevail in the Coverage Action, they may cease defending Plant, leaving many claimants without a means for recovery. The Plan is the only resort available to treat all meritorious claims equally, a result that is not possible if asbestos injury claimants are left to litigate their claims in the tort system exclusively. It is therefore no answer that litigation is available to claimants in

---

**29.** It bears emphasis that it is not necessary to resolve that question, as it is not squarely presented by the present appeal.

**30.** In fact, as the sole committee bill specifically noted: "the asbestos trust/injunction

mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelmingly liability." *See* H.R.Rep. No. 103–835 at 41(1994) (emphasis added).

the tort system currently, and will remain an option (subject to the Plan's procedures), post-confirmation.

■ Somewhat relatedly, Appellants maintain that the Plan is specifically designed to increase the pressure to settle outstanding coverage disputes. It accomplishes this by cutting off actions against Settling Insurers, and eliminating Non–Settling Insurers' contribution claims. As the Bankruptcy Court correctly held, whether or not the Plan was structured to alter Non–Settling Insurers' incentives to resolve coverage disputes is not properly considered as a question of good faith because § 1129(a)(3)'s standard turns primarily on satisfaction of the Code's objectives, less the subjective intent of the parties involved. As both the Bankruptcy Court's opinions and this order conclude, prompt and equitable resolution of legitimate asbestos injury claims is the policy promoted by the Code, an end the Plan clearly advances.

■ Next, Appellants question whether the good faith requirement has been satisfied in connection with the merger, which they characterize as a sham transaction designed to exploit the Bankruptcy Code and afford asbestos injury claimants an opportunity to obtain a greater recovery than they would otherwise receive. Appellants question the means by which the merger was accomplished, as well its implications under the Code. The Bankruptcy Court, however, correctly found that no aspect of the transaction raises cause for concern under the rubric of "good faith." Although Plant's bankruptcy is, unsurprisingly, painful to all involved and especially its creditors, the debtor's efforts to avail itself of the benefits provided by the Code, via the merger, do not support a finding of bad faith. *In re Sylmar Plaza, L.P.,* 314 F.3d at 1075. As for the allegation that Bayside was coerced by the Plan Proponents into the merger transaction, the Bankruptcy Court recognized no indication of bad faith, within the meaning of § 1129(a)(3). Specifically, it found the successor-in-interest doctrine invoked by the Pre–Petition Committee and the Plan Proponents to sue Bayside to be a plausible theory of recovery, holding: "California courts have imposed successor liability on the transferee corporation in similar circumstances." Confirmation Order, at 35–36 (citing *Kaminski v. Western MacArthur Co.,* 175 Cal.App.3d 445, 220 Cal.Rptr. 895 (1985)). Noting that the Plan would insulate both Plant and Bayside from the uncertainties of future litigation, and permit them to preserve their remaining value, collectively, the Court held that its advancement would serve the objectives of the Code, and thereby meet § 1129(a)(3)'s requirements.[31] The premise and reasoning reflected in the Court's confirmation order is sound.

Appellants' additional contention, that the merger transactions operate improperly within the statutory scheme of § 524(g), is not persuasive, as the Bankruptcy Court correctly determined. Following the Bankruptcy Court's findings, the Plan Proponents stress that the merger enabled the Plan to satisfy § 524(g)'s going-concern requirement, and in turn, prompted over $100 million in settlement proceeds to become available to Plant's creditors—a result of reorganization they see as fundamentally consistent with the Code's objectives, and hence, an indication of good faith for purposes of § 1129(a)(3). Under Ap-

---

31. The Bankruptcy Court applied similar logic to Ameli and Badakhshan, reasoning that they had relatively little liability exposure as individuals, and had personally surrendered substantial assets, in the form of ownership stakes, to the Trust. This finding, similarly, was not erroneous.

pellants' view of the case, the merger was designed merely for purposes of satisfying § 524(g)'s going-concern requirement. As noted above, that is not the case: the merger was justified by legitimate business considerations, and to preserve the going-concern value of Plant, as well as Bayside. Even putting that issue aside, however, there is simply no authority in support of Appellants' argument that a merger transaction such as the one proposed here violates the Code, particularly where, as here, it advances the ultimate objectives of § 524(g). In sum, the Bankruptcy Court's finding that the Plan was "proposed in good faith" was well-founded, and must be affirmed.

#### 5. Appointment of counsel

 U.S. Fire (USF), a Non–Settling Insurer that joins Appellants' arguments, filed a separate brief to challenge the role of the law firm, Sheppard Mullin Richter & Hampton, LLP, as counsel for the Committee. USF contends that Sheppard Mullin should not have been appointed counsel by the Bankruptcy Court due to various alleged conflicts. As an initial matter, the parties disagree as to whether USF's argument qualifies as a procedurally proper appeal from the Confirmation Order, or as a premature attempt to challenge the Bankruptcy Court's order appointing Sheppard Mullin (the Employment Order), an order which the parties appear to agree is not yet final.[32] While it appears doubtful the Court even has jurisdiction over USF's appeal insofar as it

challenges the propriety of the Employment Order, rather than the Confirmation Order, that issue need not be reached because USF effectively failed to raise the issue before the Bankruptcy Court for purposes of appellate review.[33] By its own admission, USF raised the objection in six lines of text, included in a 25–page list of objections presented to the Bankruptcy Court. No factual evidence was presented in support of the objection to the Court. As the Plan Proponents further stress, the objection was raised nowhere in the over 250 pages of briefing of the confirmation motion before the Bankruptcy Court. Not surprisingly, the only ruling elicited by such reference was a summary, blanket denial by the Court, without any specific reference to the appointment of counsel. Absent a more fulsome record, there is simply nothing of substance to consider upon review.[34] *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir.1989). USF's appeal is therefore denied.

### V. CONCLUSION

The Bankruptcy Court's Confirmation Order is hereby affirmed.

IT IS SO ORDERED.

### ORDER DENYING STAY PENDING APPEAL TO THE NINTH CIRCUIT

### I. INTRODUCTION

This case arises from the complex Chapter 11 bankruptcy of Plant Insulation

---

**32.** USF attempted to appeal the Employment Order to this Court at the time of Sheppard Mullin's appointment. *See In re Plant Insulation Co.*, No. C 09–4222 (N.D.Cal.). This Court dismissed the appeal, however, because the Employment Order was not "final" for jurisdictional purposes.

**33.** Appellees' motion to strike USF's brief is therefore denied as moot.

**34.** Although USF has now briefed its position more fully, its references are not to the record developed in support of the Court's Confirmation Order, but to earlier proceedings in connection with the appointment of counsel. To rule on matters not adequately raised before the Bankruptcy Court would be unfair and improper.

Company, which sold, installed and repaired asbestos-containing insulation and fireproofing materials in Northern California. On October 9, 2012, this Court issued a detailed order denying the appellant's appeal from the bankruptcy court's confirmation of the restated second amended plan of reorganization, as well as an order affirming confirmation of the restated second amended plan of reorganization. The appellant insurers now move for an emergency stay of these orders for thirty days or until the Ninth Circuit rules on appellants' yet-to-be filed request for a stay pending appeal, whichever is longer. Simultaneously, appellants also requested that their motion for a stay be heard on shortened time. The motion for shortened time is denied as moot, as an order providing for an accelerated briefing schedule on the motion for a stay has already been entered pursuant to a stipulation executed by the parties.

The 14-day automatic stay of the October 9, 2012, confirmation orders expired on October 23, 2012. The parties stipulated to a briefing schedule on the motion to stay under which briefing was completed on October 24, 2012. The motion was submitted without oral argument pursuant to Local Rule 7-1(b). Plan Proponents have represented that the plan will not become effective until November 9, 2012, when it will be consummated through the merger of Plant and Bayside. That date is fast-approaching. Time remains therefore within which application may be made to the Ninth Circuit for an emergency stay pending appeal before the merger occurs. Due to the speed with which this order must be issued, it does not address every issue raised by the parties but rather focuses on the most glaring weakness in appellants' application: the failure to establish that a stay is necessary to prevent irreparable injury.[1]

## II. BACKGROUND

The background of this case, well known to the parties, is set forth in the October 9, 2012 order denying appeal from confirmation of the restated second amended plan of reorganization, docket number 109, and need not be revisited here. Suffice it to say, appellees represent that the merger of Plant and Bayside needs to be completed by November 25, 2012, because Bayside must make a $1.1 million payment to the IRS by that date under the terms of an Offer in Compromise for back taxes, and Bayside cannot make that payment unless the merger has closed. When the plan becomes effective, the Settling Insurers will make $17.125 million in settlement payments. In addition, the tort cases of asbestos victims and their families will be able to proceed in state court against Plant.

---

1. In connection with the briefing on the motion to stay, the parties each filed an ancillary motion. Appellants filed a motion to strike the declaration of Kristin A. Pace in support of the Plan Proponents' opposition to the motion for a stay. Ms. Pace's declaration is not improper expert testimony on tax law. Her declaration is based on her own personal experiences as a tax lawyer for parties in this case and does not lack foundation.

Plan Proponents (or "Appellees") have requested that judicial notice be taken of a brief filed in support of an emergency motion for a stay pending appeal before the Ninth Circuit in another bankruptcy case, *In re Thorpe Insulation Co.*, 10-56543, as well as the Ninth Circuit's docket sheet for that case. While the filing of briefs and case dockets may in the certain circumstances be the proper subject of judicial notice, here Plan Proponents do not ask for judicial notice of adjudicative facts as allowed under Federal Rule of Evidence 201(b). Instead, Plan Proponents request judicial notice of the content and persuasiveness of legal arguments made in a different case. Both motions are denied.

## III. LEGAL STANDARD

Appellants, as movants, bear the burden of establishing each of the four factors required in order for a stay to issue. *See Nken v. Holder,* 556 U.S. 418, 433, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Those are: " '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.' " *Id.* at 434, 129 S.Ct. 1749 (quoting *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)). "There is substantial overlap between these and the factors governing preliminary injunctions." *Id.* at 434, 129 S.Ct. 1749. "The first two factors ... are the most critical." *Id.* The factors may be weighed on a sliding scale, where "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir.2011) (holding that the sliding-scale standard for granting preliminary injunctions survives *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)); *see also Leiva–Perez v. Holder,* 640 F.3d 962, 966 (9th Cir.2011) (holding that the sliding-scale approach also survives *Winter* in the context of stays) ("Although there are important differences between a preliminary injunction and a stay pending review ... we do not believe they would support a balancing approach for preliminary injunctions but not stays." (citation omitted)). For example, even if the movant is unable to make a strong showing that he is likely to succeed on the merits, as long as "serious questions going to the merits" are raised, a stay may be appropriate where "the balance of hardships tips sharply in the plaintiff's favor." *Id.* at 1135. The scale only slides so far, though; a demonstration that irreparable injury is likely, rather than just possible, is always required of the movant. *See Nken,* 556 U.S. at 435, 129 S.Ct. 1749.

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

In the context of a stay pending appeal, "[c]ourts do not rigidly apply the success on the merits factor because a rigid application would require the district court 'to conclude that it was probably incorrect in its determination on the merits.' " *Divxnetworks, Inc. v. Gericom AG,* No. 04–cv–2537, 2007 WL 4538623, at *3 (S.D.Cal. Dec.19, 2007) (quoting *Protect Our Water v. Flowers,* 377 F.Supp.2d 882, 884 (E.D.Cal.2004)). The Court stands by its analysis of the merits, but admits that this is a difficult case. The plan had many "unique features" that required wrestling with and resolving novel legal issues. Dkt. 109 at 3:9. The order denying appeal from confirmation acknowledged that "[a]ppellants raise[d] a number of credible objections to confirmation" and that their "arguments [we]re significant." *Id.* at 3:8–10. Here, appellants have met the threshold for the first factor, establishing that their appeal will raise "strong questions going to the merits." *Wild Rockies,* 632 F.3d at 1135.

### B. Likely Irreparable Harm

Appellants argue that they will suffer three forms of irreparable injury absent a stay. First, they fear that Plan Proponents will substantially implement the plan, including closing on the merger of Plant and Bayside, which will potentially render their appeal moot. In the bankruptcy context, courts within the Ninth Circuit have held that "the risk that an appeal may become moot does not by itself constitute irreparable injury." *In re Full-*

*mer*, 323 B.R. 287, 304 (Bankr.D.Nev. 2005); *see also Red Mountain Machinery Co.*, 451 B.R. 897, 908 (Bankr.D.Ariz.2011); *In re Irwin*, 338 B.R. 839, 853 (E.D.Cal. 2006). Even if the risk of mootness could constitute irreparable injury, appellants have not shown that such risk is likely, but rather merely speculative. The Ninth Circuit recently held in *In re Thorpe Insulation Co.*, 677 F.3d 869 (2012), that the consummation of the plan of reorganization had not mooted the appeal before it. In light of this holding, even if the plan has been substantially performed by the time that appellants' appeal is heard, appellants have not established that it is likely, rather than just possible, that their appeal would be held to be moot by the Ninth Circuit.

Appellants argue that even if the threat of mootness alone is not enough to establish irreparable injury, it can constitute such injury when considered in addition to other harms. Appellants also claim that each additional harm they would suffer would independently constitute an irreparable injury sufficient to support a stay. The first of these is that if the plan becomes effective, Settling Insurers would transfer over $17 million in payments and take the position that they cannot be sued by appellants for contribution as to those amounts even if the confirmation order is ultimately reversed. The second is that claimants would have incentives to race to the courthouse to file suits against Plant that otherwise would not have been brought given the risk that the confirmation could be reversed by the Ninth Circuit. These are not irreparable injuries sufficient to support the issuance of a stay. Each harm identified is essentially financial in nature. "It is well established, however, that such monetary injury is not normally considered irreparable." *Los Angeles Mem'l Coliseum Comm'n v. N.F.L.*, 634 F.2d 1197, 1202 (9th Cir.1980). Additionally, each harm is speculative. It cannot be said that they are likely to occur, because in order for appellants ultimately to suffer the harm feared, independent actors would have to take certain actions and legal positions *and* the courts would have to rule in particular ways on legal issues raised by the resulting situations. Appellants have only shown that an irreparable injury is possible, but not that it is likely. The Supreme Court instructs that in such situations, a stay may not issue. *See Nken*, 556 U.S. at 435, 129 S.Ct. 1749. Therefore, an analysis of the remaining factors, the balance of hardships and the public interest is not necessary.

## V. CONCLUSION

Appellants have failed to demonstrate that it is likely to suffer an irreparable injury. The motion for an emergency stay is denied.

IT IS SO ORDERED.